UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MUJAAHID HARRIS,

Plaintiff,

v.

VALLADOLID, *et al.,*

Defendants.

No.  1:23-cv-01502-KES-EPG (PC)

FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE DENIED

(ECF No. 79)

OBJECTIONS, IF ANY, DUE WITHIN THIRTY (30) DAYS

Plaintiff Mujaahid F. Harris ("Plaintiff") is proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983.  This case proceeds on Plaintiff's Eighth Amendment excessive force claims against Defendants Valladolid, Ramirez, Forbes, and Patrick and Plaintiff's Eighth Amendment failure to protect claim against Defendants Butler and Osmer related to an incident that took place on September 18, 2022.  (ECF No. 9).  Specifically, it concerns whether Defendants used excessive force and failed to protect Plaintiff when they restrained Plaintiff by handcuffing him behind his back rather than using waist chains, which had been authorized by the prison due to Plaintiff's shoulder impairment.

On October 29, 2025, Defendants Ramirez, Valladolid, Forbes, Osmer, Patrick, and Butler Defendant filed a motion for summary judgment, arguing that even viewing all facts in the light most favorable to Plaintiff, no reasonable jury could find that the defendants' conduct

1

constituted excessive force or failure to protect under the Eighth Amendment. For similar reasons, Defendants argue are they are entitled to qualified immunity.

For the reasons set forth below, the Court will recommend that Defendants' motion for summary judgment be denied.

## I.   BACKGROUND

### A.  Plaintiff's First Amended Complaint

This case proceeds on Plaintiff's First Amended Complaint filed on February 2, 2024. (ECF No. 8).  Plaintiff alleges as follows:

Following a failed left shoulder replacement, Plaintiff has permanent shoulder damage and has a "special cuffing" requirement using waist chains. (*Id*. at 3).  On September 13, 2022, Plaintiff alleged Officer Valladolid wrenched Plaintiff's left arm behind his back, violating the procedure for "special cuffing." (*Id.*).  At the time, Plaintiff was holding his left arm to his chest while Officers Valladolid and Ramirez tried to pull Plaintiff's arms apart. (*Id*.).  Officer Valladolid was on Plaintiff's left, and Officer Ramirez was on Plaintiff' right. (*Id.*). Officer Patrick was at Plaintiff's legs, pressing on his lower back. (*Id.*).  While Plaintiff was in the prone position, Officer Forbes was near Plaintiff's head, pressing down on Plaintiff's upper back and neck and using his free hand to pull Plaintiff's arm out from underneath Plaintiff's body. (*Id.* at 3, 5).

Plaintiff allegedly told the officers that he was unable to place his arms behind his back and that a "special cuff" procedure should be followed due to his shoulder impairment. (*Id.* at 5). Plaintiff pleaded with Sergeants Butler and Osmer to intervene before Officers Valladolid, Ramirez, Patrick and Forbes further injured Plaintiff's arm. (*Id.*).

Plaintiff was led to believe that special cuffs would be used because Sergeant Butler instructed Officer Patrick to get the chains. (*Id.*) Plaintiff was asked to put his arms to the side, and he reiterated that he could not put his arms behind him, to which someone said, "okay, okay," but when Plaintiff released his grip, Officer Valladolid wrenched Plaintiff's left arm back and up behind his back, toward his shoulder blades. (*Id.*).  Plaintiff alleges that as a result of this incident, he has permanent nerve damage in his left arm and shoulder. (*Id.*)

**B. Screening Order**

The Court screened Plaintiff's first amended complaint and found that it could proceed on claims for excessive force and failure to protect related to Plaintiff's allegations that defendants failed to use the special cuffing procedure that had been authorized by the prison due to Plaintiff's shoulder injury.  (ECF No. 9 at 9).

Specifically, regarding Plaintiff's claim for excessive force, the Court's screening order stated:

> Based on the allegations in Plaintiff's complaint, the Court finds that Plaintiff sufficiently states a claim for excessive force against Defendants Valladolid, Ramirez, Forbes, and Patrick to proceed past screening. Plaintiff alleges that Defendants was aware of his need to be restrained according to a special protocol and that Plaintiff was attempting to comply with a demand. Liberally construed, these allegations sufficiently state a claim against Defendants Valladolid, Ramirez, Forbes, and Patrick for excessive force in violation of the Eighth Amendment. *See Howell v. Johnson*, No. 2:19-cv-0611-DB, 20202 WL 8816313, at *4 (E.D. Cal. Jan. 29, 2020) ("Since plaintiff claims that [defendant] used unnecessary force in that he twisted and slammed plaintiff's hand and wrist while plaintiff was complying with a command to cuff up, plaintiff may proceed on this claim, as well.").

(ECF No. 9 at7-8).  Specifically, regarding the failure to protect claim, the Court's screening order stated:

> Based on these allegations, Plaintiff has sufficiently alleged that Defendants Butler and Osmer were aware that Plaintiff faced a specific risk of harm if Defendants Valladolid, Ramirez, Forbes, and Patrick failed to follow the special restraint protocol and that Defendants Butler and Osmer has a reasonable opportunity to intervene by providing further instruction after instructing Defendant Forbes to obtain the chain. Accordingly, the Court finds that Plaintiff's Eighth Amendment failure to protect claims against Defendants Butler and Osmer should proceed past screening.

(ECF No. 9 at9).

## II.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### a.  Defendants' Motion for Summary Judgment

Defendants moved for summary judgment on October 29, 2025. (ECF No. 79). Defendants concede that Harris had permission for special cuffing procedures and that Defendants did not follow those procedures in restraining him.  Nevertheless, they claim that application of the relevant factors for excessive force claims to the facts show that no reasonable

jury could find that defendants used excessive force or failed to protect Harris by cuffing him behind his back rather than follow the special cuffing procedures.

Defendants' motion describes the events that preceded the restraint of Plaintiff. Defendants then provide the following description of the facts regarding why they handcuffed him behind his back rather than follow the special cuffing procedures:

> While Harris was holding onto the grill gate and while he was prone on the ground, Harris stated several times that he had a shoulder replacement, was "special cuff," and could not put his arms behind his back. (DSUF ¶ 34.) However, because Harris was not wearing his mobility vest at the time of the incident, and because Valladolid and Ramirez were not familiar with Harris or his medical history at that point, Valladolid and Ramirez did not know whether Harris was telling the truth about having special cuffing requirements. (DSUF ¶¶ 35-36.) Valladolid and Ramirez also could not go back into the Office to confirm if Harris had special cuffing requirements because they were both actively holding and attempting to restrain Harris. (DSUF ¶ 37.) Based on their training and experience, Valladolid and Ramirez also understood that the special cuffing requirements do not apply in emergency situations. (DSUF ¶ 38.) In emergency situations, such as when an incarcerated person is physically resisting against being restrained, officers can use regular handcuffs to restrain the resisting inmate and that any specialized restraints (such as waist chains) can be applied once the emergency is over. (*Id.*) Moreover, due to Harris's continued resistance and their inability to gain control of his actions, Defendants did not believe they had the time or ability to obtain alternative restraints and apply them to Harris. (DSUF ¶ 37.)
>
> While Valladolid and Ramirez were holding Harris on the ground, other responding staff arrived at the scene to assist them. (DSUF ¶ 39.) The responding staff included Officer C. Forbes, Officer T. Patrick, Sergeant B. Butler, and Sergeant P. Osmer. (*Id.*)
>
> While Valladolid and Ramirez were kneeling beside Harris, Patrick placed Harris's legs in leg restraints and took a position by Harris's legs, and Officer Forbes knelt by Harris's head. (DSUF ¶ 40.) Officer Valladolid and Ramirez then ordered Harris multiple times to put his hands behind his back, which Harris refused to obey. (DSUF ¶ 41.) Ramirez also ordered Harris to place his hands to the side so that they could confirm Harris was not holding anything in his hands, but Harris refused to show his hands or place his hands by his sides. (DSUF ¶ 42.) To overcome Harris's physical resistance and to effect custody, Forbes and Valladolid took hold of Harris's left arm and moved Harris's left arm from underneath his body to behind his back. (DSUF ¶ 43.) Forbes and Ramirez then moved Harris's right arm behind his back, and Patrick placed handcuffs on both of Harris's wrists. (*Id.*) Once Harris was secured in handcuffs, the officers assisted Harris to a standing position and escorted Harris outside of the building where medical staff were waiting to examine him. (DSUF ¶ 44.)

4

(ECF No. 79-3 at 4-5).

Defendants then explain that, "[f]ive factors bear on the excessive force analysis in a typical Eighth Amendment claim: (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Bearchild v. Cobban*, 947 F.3d 1130, 1141 (9th Cir. 2020). at 1141 (citations and quotations omitted).

Defendants' motion does not address the first factor, the extent of injury suffered by an inmate.

Regarding the need for application of force and the relationship between that need and the amount of force used, Defendants argue: "Once on the ground, and even after responding staff arrived, Harris continued to physically resist by placing his hands and arms underneath his body and refusing to obey Valladolid's and Ramirez's orders to put his arms behind his back. (DSUF ¶¶ 31-33, 39-42.) Because Harris refused to obey those lawful orders, Valladolid, Ramirez, Forbes, and Patrick used force to move Harris's hands from underneath his body to behind his back and placed him in handcuffs. (DSUF ¶ 43.)"  (ECF No. 79-3, at p. 8).  Defendants also argue that that special cuffing procedures do not apply in emergency situations, citing *Dukes v. Lizaola*, No. C 10–0864 CRB (PR), ECF No. 46 (N.D.Cal. July 22, 2011) (Breyer, J.), *aff'd* 486 F. App'x 642 (9th Cir. 2012).  Moreover, Defendants argue that "[e]ven if Harris disagreed with the Officers' orders to submit to being handcuffed behind his back, Harris's refusal to comply with those orders presented a threat to the safety and security of the prison." (*Id.*).

Regarding the threat reasonably perceived by the responsible officials, Defendants argue: "once on the ground, Harris continued to physically resist against being restrained by placing his hands and arms underneath his body, and he refused to obey the Officers' repeated orders to place his hands behind his back or by his sides. (DSUF ¶¶ 31-33, 41-43.) Given these circumstances, including Harris's constant refusal to obey orders and his physical resistance, Valladolid, Ramirez, Forbes, and Patrick reasonably perceived Harris's non-compliance as a threat that necessitated the use of force to overcome Harris's resistance and place him into custody." (ECF No. 79-3 at 9).

Regarding any efforts made to temper the severity of a forceful response, Defendants state: "Once on the ground, Valladolid and Ramirez continued to temper their response by ordering Harris to put his hands behind his back and submit to restraints. (DSUF ¶¶ 31-32.) However, Harris refused to obey those orders and physically resisted by holding his hands and arms underneath his body. (*Id.*) As a result, Valladolid and Ramirez, as well as Patrick and Forbes once they arrived on the scene, needed to use force to move Harris's hands behind his back and place him in handcuffs." (ECF No. 79-3 at 10).

Regarding the failure to protect claim, Defendants argue that "the undisputed facts demonstrate that Defendants Osmer and Butler were not aware that Harris was at risk of a serious risk of harm from being handcuffed behind his back or that the force used on him was excessive." (ECF No. 79-3 at 11).

Defendants also argue that they are entitled to qualified immunity for failing to use Harris' special cuffing procedures because "a reasonable officer in Defendants' positions could have believed that using force to handcuff Harris under the circumstances was a lawful good faith effort to maintain or restore prison discipline." (ECF No. 79-3 at 14).

In support of the motion for summary judgment, Defendants submit the following evidence: (1) Defendant Valladolid's body-worn camera video footage; (2) Defendant Ramirez's body-worn camera video footage; (3) portions of Plaintiff's deposition; (4) declaration of Defendant Ramirez; and (5) declaration of Defendant Valladolid.[1]

Defendants also provided a statement of undisputed facts in support of the motion for summary judgment as required under Local Rule 260(a). (ECF No. 79-2 at 1-6). Additionally, Defendants also provided Plaintiff with a *Rand*[2] warning informing him what is required to oppose summary judgment under Federal Rule of Civil Procedure 56 and a summary of Local Rule 260 regarding statements of undisputed facts. (ECF No. 79-1 at 1-3).

### b. Plaintiff's Opposition

Plaintiff timely filed an opposition motion on December 4, 2025. (ECF No. 84). Plaintiff's opposition devotes substantial attention to disputing Defendants' description of the events leading

---

[1] Defendants Forbes, Patrick, Butler and Osmer did not submit any declarations in support of Defendants' motion.

[2] *See Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998).

to him being restrained.

> Regarding Defendants' restraint of Plaintiff, Plaintiff describes the incident as follows: Valladolid . . . attempted to put Plaintiff's arm behind his back and as Plaintiff began to explain to Valladolid that he was 'special cuff,' Valladolid attempted to slam Plaintiff into the grill gate. . . . After being slammed into the grill gate, Ramirez entered the Office. Plaintiff grabbed onto the grill gate as Valladolid attempted to slam him onto the ground. Because Valladolid was 'out of control' Plaintiff acted in the only manner available to him in an attempt to deescalate the situation and prevent him from being hurt by holding onto the grill gate while pleading with the officers trying to cuff him in back, that he is 'special cuff,' this is not necessary, etc. As the officers refused to pause in their efforts to slam me and cuff me in back, Harris was forced to 'drop to the ground onto his right side,' which Plaintiff immediately grabbed ahold of his left arm. Valladolid then lifted Harris up and slammed him down onto his chest area, grabbed Harris' legs rolling him fully onto a prone position.
>
> Throughout this entire ordeal, Plaintiff continuously pleaded with Valladolid and Ramirez that he is special cuff, cannot put his arms behind his back. Wearing or not wearing a mobility vest does not determine if special cuffs are used or not. Valladolid was in fact familiar with Plaintiff and the fact that Harris wore an arm sling when he generally stepped out the cell or the building. . . . [There] was definitely enough time to confirm that I needed alternative restraints. Plaintiff was only holding his injured arm. This was not an emergency situation.
>
> Rest of the Defendants arrived. It was impossible for Harris to put his arm behind his back due to his failed shoulder replacement. When Plaintiff was instructed to put his hands to the side, Plaintiff re-iterated that he cannot put hands behind him and he states 'ok' and was immediately asked several questions which Plaintiff responded to and the officers never relaxed and gave Harris the opportunity to release his arms.

(ECF No. 84 at 3-4) (citations to supporting evidence omitted).

In support of his motion for summary judgment, Plaintiff filed: (1) his own declaration; (2) a hand-drawn depiction of the officers' office (*Id.* at 23); and (3) a five prison remedial plan under *Armstrong*, that provides a list of requirements needed at prisons for "qualified inmates with a permanent physical or mental impairment that substantially limits a major life activity" (*Id.* at 24-56).

Plaintiff also provided a statement of undisputed facts in support of the motion for summary judgment as required under Local Rule 260(a).

\\\

7

**c. Defendants' Reply**

Defendants filed a reply on December 18, 2025. (ECF No. 86).  Again, Defendants devote much of their reply to reiterating their version of events that preceded their decision to restrain Plaintiff.

Regarding the decision to handcuff Plaintiff behind his back, Defendants then argue that "[t]he evidence shows four out of five factors [used to evaluate excessive force claims] weigh in Defendants' favor."  (ECF No. 86 at 2).  Defendants argue that even though Plaintiff was on the ground being hold down by multiple officers, "Harris continued to physically resist by placing and holding his hands and arms together underneath his body and refusing to obey Valladolid's and Ramirez's orders to put his arms behind his back."  (ECF No. 86 at 4).  Defendants argue that force was necessary to put his arms behind his back because "Harris physically resisted against their attempts to move his arms behind his back, refused to obey multiple orders to place his arm behind his back or to the side, and that the Officers only placed Harris in handcuffs after using force to overcome Harris's resistance and move his arms out from underneath Harris's body."  (ECF No. 86 at 5).  Thus, "[e]ven if Harris disagreed with the officers' orders to submit to being handcuffed behind his back, Harris's refusal to comply with orders presented a threat to the safety and security of the prison."  (ECF No. 86 at 5-6).

Regarding the failure to protect claim against Defendants Osmer and Butler, Defendants argue that "there is also no material dispute of fact regarding whether Osmer and Butler were aware that the force being used on Harris was excessive, or that they consciously chose to ignore it."  (ECF No. 86 at 8).

Regarding qualified immunity, Defendants again argue that "a reasonable officer in Defendants' positions could have believed that using force to handcuff Harris under the circumstances was a lawful good faith effort to maintain or restore prison discipline."  (ECF No. 86 at 8).

**III.    EVIDENCE PRESENTED BY THE PARTIES**

The Court next reviews the evidence presented by the parties regarding Defendants' decision to restrain Plaintiff by handcuffing his arms behind his back rather than using waist

chains, as required by the prison's special cuffing protocol for Plaintiff.[3]

### i. Defendant Ramirez's Declaration

Defendant Ramirez declared under the penalty of perjury that:

Once on the ground, Harris placed both of his hands and arms underneath his body to prevent me and Officer Valladolid from placing him in restraints. Officer Valladolid and I gave Harris multiple orders to Harris to put his arms behind his back, but Harris refused to obey those orders. I attempted to place Harris in restraints by grasping Harris's right arm from underneath him, but I was unable to overcome Harris's physical resistance at that point.

While Harris was holding onto the grill gate and while he was prone on the ground, Harris stated several times that he had a shoulder replacement, was "special-cuff," and could not put his arms behind his back. However, because Harris was not wearing a mobility vest, and because I was not familiar with Harris or his medical history at that point in time, I was unable to tell from Mr. Harris's words alone whether he was telling the truth about having special cuffing requirements. I also could not go back to the Office to confirm if Mr. Harris had any special cuffing requirements because Officer Valladolid and I were actively holding and attempting to restrain Mr. Harris.

Based on my training and experience, it was my understanding at the time that the special-cuffing requirements do not apply to emergency situations. In emergency situations, such as this one where an incarcerated person is physically resisting against being restrained, it was my understanding that officers can use regular handcuffs to restrain the resisting inmate and that any specialized restraints (such as waist restraints) can be applied once the emergency is over.

While Officer Valladolid and I were actively holding Harris prone on the ground, responding staff arrived at the scene of the incident to assist us. The responding staff included Officer C. Forbes, Officer T. Patrick, Sergeant B. Butler, and Sergeant P. Osmer.

While I was kneeling to Harris's right side, Officer T. Patrick placed Harris's legs in leg restraints and took a position by Harris's legs, and Officer Forbes knelt by Harris's head. Officer Valladolid and I then ordered Harris multiple times to put his hands behind his back, which Harris refused to obey. I also ordered Harris to place his hands to the side so that we could confirm Harris was not holding anything in his hands, but Harris refused to show his hands or place his hands by his sides. To overcome Harris's physical resistance and to effect custody, Officer Forbes and Officer Valladolid took hold of Harris's left arm and moved

---

[3] The parties also present substantial evidence regarding the events leading up to Defendants' decision to restrain Plaintiff. Given that this case only concerns Plaintiff's claims of excessive force and failure to protect regarding Defendants' decision to handcuff him behind his back in violation of special cuffing procedures, the Court will not summarize the parties' competing evidence regarding the events that led to Defendants' decision to restrain Plaintiff.

Harris's left arm from underneath his body to behind his back. Officer Forbes and I then moved Harris's right harm behind his back, and I saw Officer Patrick place handcuffs on both of Harris's wrists. Once Harris was secured in handcuffs, the other responding officers assisted Harris to a standing position and escorted Harris outside of the building to be evaluated by medical staff waiting outside of the building.

(ECF No. 79-5 at 3) (paragraph numbers omitted).

### b. Defendant Valladolid's Declaration

Defendant Valladolid declared under the penalty of perjury that:

Once on the ground, Harris placed both of his hands and arms underneath his body to prevent me and Officer Ramirez from placing him in restraints. Officer Ramirez and I gave Harris multiple orders to Harris to put his arms behind his back, but Harris refused to obey those orders. I attempted to place Harris in restraints by grasping Harris's left hand from underneath him, but I was unable to overcome Harris's physical resistance at that point.

While Harris was holding onto the grill gate and while he was prone on the ground, Harris stated several times that he had a shoulder replacement, was "special-cuff," and could not put his arms behind his back. However, because Harris was not wearing a mobility vest, and because I was not familiar with Harris or his medical history at that point in time, I was unable to tell from Mr. Harris's words alone whether he was telling the truth about having special cuffing requirements. I also could not go back to the Office to confirm if Mr. Harris had any special cuffing requirements because Officer Ramirez and I were actively holding and attempting to restrain Mr. Harris.

Based on my training and experience, it was my understanding at the time that the special-cuffing requirements do not apply to emergency situations. In emergency situations, such as this one where an incarcerated person is physically resisting against being restrained, it was my understanding that officers can use regular handcuffs to restrain the resisting inmate and that any specialized restraints (such as waist restraints) can be applied once the emergency is over.

While Officer Ramirez and I were actively holding Harris prone on the ground, responding staff arrived at the scene of the incident to assist us. The responding staff included Officer C. Forbes, Officer T. Patrick, Sergeant B. Butler, and Sergeant P. Osmer.

While I was kneeling to Harris's left side, Officer T. Patrick placed Harris's legs in leg restraints and took a position by Harris's legs. Officer Forbes knelt by Harris's head. Officer Ramirez and I then gave Harris multiple orders to put his hands behind his back, which Harris refused to obey. Officer Ramirez alternatively ordered Harris to place his hands to the side so that we could confirm Harris was not holding anything in his hands, but Harris refused to show his hands or place his hands by his sides. To overcome Harris's physical resistance and to effect

custody, Officer Forbes and I took hold of Harris's left arm and guided Harris's left arm from underneath his body to behind his back. I then observed as Officer Forbes and Officer Ramirez guided Harris's right harm behind his back, and I observed as Officer Patrick placed handcuffs on both of Harris's wrists. Once Harris was secured in handcuffs, the other responding officers assisted Harris to a standing position and escorted Harris outside of the building.

(ECF No. 79-6 at 3-4) (paragraph numbers omitted). [4]

### c. Plaintiff's Deposition

On August 13, 2025, Plaintiff was deposed by Deputy Attorney General Brian Chan. (ECF No. 79-4).  During the deposition, Plaintiff stated that he informed Defendant Valladolid that he would turn around and cuff up, but Defendant needed to get the waist chains because Plaintiff was special cuff. (*Id.* at 25). Plaintiff had approached the grille gates because the waist chains used for special cuffing were in the control booth. (*Id.*). Plaintiff stated that "they started trying to pull me over and I'm telling him to calm down. I can't cuff up in the back. I'm special cuff. I have an effed up shoulder." (*Id.*). Plaintiff stated he continued to say he needed waist chains and that he could not be handcuffed behind his back throughout the incident with both Defendants Ramirez and Valladolid present. (*Id.* at 31-32).

During his deposition, Plaintiff described his position while prone on the ground to Mr. Chan, who recounted it as follows:

> Q. Let me verbally describe it for the record. You have your arms in front of you by your stomach. Your right hand is holding on to your left wrist and your left wrist is holding on to your body. Is that roughly how you remember positioning your arms on the day of the incident?
>
> A. Yes.

(*Id.* at 37). Mr. Chan inquired if Plaintiff recalled Defendant Valladolid or Ramirez ordering him to let go of his arms and submit to being handcuffed, and the following dialogue ensued:

> A. Yeah. They kept telling me cuff up. I said, I'm not going to cuff up behind my back. I'm special cuff. I can't. So no, I'm not going to do that.
>
> Q. Okay. So basically, whenever they gave you that order you -- did you respond by telling them, I'm special cuff, I can't be handcuffed behind my back?

---

[4] It is worth noting that Defendants Forbes, Patrick, Butler and Osmer did not submit any declarations in support of Defendants' motion.  Nor have defendants submitted any evidence regarding policies or procedures for restraining inmates, in emergency situations or otherwise.

11

A. Yes, yes.

Q. Okay. Do you remember approximately roughly how many times they ordered you to be handcuffed and how many times you told them you couldn't be handcuffed behind your back?

A. I don't remember how many times. Every time they said that I said what I said. So, I don't know how many times it was. It was over and over and over.

(*Id.* at 37-38).

### d.  Plaintiff's Declaration

In Plaintiff's declaration, Plaintiff states under penalty of perjury:

Plaintiff had a medical impairment preventing him from actively placing his left arm behind him and above his chest.  He consistently explained that to Valladolid and Ramirez every time they instructed him to place his hand behind him.  All the while they continued to try and force Plaintiff's arms behind him.

Plaintiff was not wearing his mobility impairment vest, which does not determine that Plaintiff is special cuffing or not.  Plaintiff is special cuffing because of a shoulder impairment which there is not a vest for.

. . .

Plaintiff was not physically resisting against being restrained.  Plaintiff could not in any way put his arm behind his back to be cuffed.  All Valladolid had to do was retrieve the waist chains as I pleaded with him . . .

Plaintiff was proned out with his arms underneath his body with a 260+ pound Patrick pushing down on his lower back and 280+ pound Forbes pushing down on his upper back.  Valladolid and Ramirez are both pulling on my arms all they had to do was stop pulling and give me a chance to maneuver my arms from up under all that weight after I said okay to have my arms to the side.  They did not give me the opportunity.  When they pulled my arms out and saw that there still wasn't anything in Plaintiff hands, Valladolid maliciously and sadistically wrenched Plaintiff['s] arm behind his back while Forbes was applying downward pressure on his upper left arm.

Defendants, following Valladolid's instruction to 'just pick his ass up,' pulled me up by my cuffed in back arms and pulled me bent over outside . . .

(ECF No. 84 at 21).

\\\

\\\

\\\

\\\

12

### a. Defendant Valladolid's Body Worn Camera Footage[5]

The Court has reviewed the body-worn camera footage from Defendant Valladolid's body-worn camera. Immediately before Defendants restrained Plaintiff, the footage shows Plaintiff lying prone on the ground face down with Defendant Ramirez and Defendant Valladolid each placing pressure on his back. Plaintiff is heard saying he cannot put his arms behind his back, and one of the Defendants saying, "put your arms to the side. What are you hiding?" Plaintiff is heard repeating he cannot put his arms behind his back. Two officers are shown entering the video, with one taking position at Plaintiff's head and another near Plaintiff's legs. One of the defendant officers tells Plaintiff to put his arms to the side, and Plaintiff loudly responds, "I told you I can't put my hands behind my back." Defendants then grab Plaintiff's arms from underneath his body.  Eventually, Defendants place handcuffs around his wrists in the back and lift Plaintiff off the ground.  Plaintiff then says "I can't do this." Defendants escort Plaintiff out of the building with multiple officers around him. Plaintiff is hunched over and appears to be crying.

## IV.   LEGAL STANDARDS

### a.  Motion for Summary Judgment

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

---

[5] While both Defendant Valladolid and Ramirez's body worn camera footage were provided for review, Defendant Ramirez's camera was knocked off during the incident with Plaintiff and he inadvertently attached Defendant Valladolid's body worn camera. As such, the Court was only able to clearly view one of the recordings. (ECF No. 79-5 at ¶ 12).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, the party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Summary judgment is appropriate for claims of excessive force when "taking the facts in the light most favorable to [the non-moving party], a reasonable jury could not find that "the officer's conduct violated a constitutional right." *Young v. County of Los Angeles,* 655 F.3d 1156, 1160 (9th Cir. 2011). In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the Court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted).

"Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005); *Torres v. City of Madera,* 648 F.3d 1119, 1123 (9th Cir. 2011) ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury, [and] only

in the absence of material disputes is it a pure question of law.") (internal quotation marks and citations omitted).

### b. Excessive Force

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not … use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is … whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).

When determining whether the force was excessive, the Court looks to the "extent of injury suffered by an inmate…, the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

While de minimis uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9.

### c. Failure to Protect

To establish a failure to protect claim, a prisoner must establish that prison officials were deliberately indifferent to a sufficiently serious threat to the prisoner's safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "'Deliberate indifference' has both subjective and objective components." *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013). A prisoner must show that "the official [knew] of and disregard[ed] an excessive risk to inmate ... safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Farmer*, 511 U.S. at 837. "Liability may follow only if a prison official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Labatad*, 714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847). When an officer is alleged to have used

15

excessive force against a prisoner, other correctional officers may also be held liable if they had a realistic opportunity to intervene and stop the violation but failed to do so. *See Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003); *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000). Thus, a plaintiff must allege that defendants were (1) aware that plaintiff faced a specific risk of harm from the correctional officer's use of excessive force, and (2) had a reasonable opportunity to intervene to stop it. *Id.*

### d.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a court is presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), receded from, *Pearson v. Callahan*, 555 U.S. 223 (2009) (the two factors set out in *Saucier* need not be considered in sequence).

"For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " *Mattos v. Agarano,* 661 F.3d 433, 442 (9th Cir. 2011) (quoting *al-Kidd*, 563 U.S. at 741) (some internal marks omitted). "The plaintiff bears the burden to show that the contours of the right were clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011). "[W]hether the law was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition." *Estate of Ford,* 301 F.3d at 1050 (citation and internal marks omitted). In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir.

2007); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (the "salient question" to the qualified immunity analysis is whether the state of the law at the time gave "fair warning" to the officials that their conduct was unconstitutional). An official's subjective beliefs are irrelevant. *Inouye,* 504 F.3d at 712.

At the summary judgment phase, although both the "clearly established right" and "reasonableness" inquiries are questions of law, where there are factual disputes as to the parties' conduct or motives, the case cannot be resolved at summary judgment on qualified immunity grounds. *See Torres v. City of Madera,* 648 F.3d 1119, 1123 (9th Cir. 2011) ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury, [and] only in the absence of material disputes is it a pure question of law.") (internal quotation marks and citations omitted).

## V.   ANALYSIS

### A.  Excessive Force and Failure to Protect Claims

Viewing this evidence in the light most favoring to Plaintiff, the Court considers whether a reasonable jury could decide that Defendants Valladolid, Ramirez, Forbes, and Patrick used excessive force against Plaintiff and Defendants Butler and Osmer failed to protect him from excessive force when they handcuffed Plaintiff behind his back, rather than use the special cuffing procedure using waist chains. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) ("Therefore, at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.").

The Court evaluates the evidence by applying the following factors: (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Bearchild v. Cobban,* 947 F.3d 1130, 1141 (9th Cir. 2020) (quoting *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013)

The Court begins with the first factor: the extent of the injury suffered by Plaintiff. Defendants do not provide any evidence or argument regarding this factor.   In Plaintiff's first amended complaint, signed under penalty of perjury, Plaintiff alleges that because Defendants placed his arms behind his back instead of utilizing special cuffing procedures, Plaintiff suffered a "reversion of a shoulder total replacement to a reversal." (ECF No. 8 at 5) Plaintiff also alleges he suffered nerve damage. (*Id.*). The Court thus finds this factor to weigh in favor of Plaintiff.

As for the the second, third and fourth factors--the need for the application of force, the relationship between that need and the amount of force used, and the threat reasonably perceived by the responsible officials —a reasonable jury could find based on the evidence that Defendants did not need to restrain Plaintiff by handcuffing him behind his back rather than by using waist chains, and that the force used to restrain Plaintiff behind his back was unnecessary.  Indeed, construing all evidence in favor of Plaintiff, a reasonable jury could find that Plaintiff did not pose any threat at the time he was handcuffed behind his back, and that there was no need to handcuff him behind his back rather than through the use of waist chains.  Although there is a substantial dispute about Plaintiff's conduct before Defendants attempted to restrain him, it is undisputed that Plaintiff was in the prone position with several officers holding him down when Defendants used the back-cuffing procedure.  (ECF No. 84 at 21) ("Plaintiff was proned out with his arms underneath his body with a 260+ pound Patrick pushing down on his lower back and 280+ pound Forbes pushing down on his upper back.  ").  Moreover, a reasonable jury could find that Defendants decided to handcuff Plaintiff behind his back in order to cause harm rather than because Plaintiff posed a danger to the officers or others.

Indeed, Defendants' motion does not argue that Plaintiff was posing a danger to officers or others at the time he was handcuffed behind his back.  Nor do Defendants present any evidence indicating that they were unable to retrieve waist chains.  Instead, Defendants argue that they were entitled to hand-cuff Plaintiff behind his back because Plaintiff was refusing orders to put his hands behind his back.  (ECF No. 86 at 4). ("Once on the ground, and even after responding staff arrived, Harris continued to physically resist by placing and holding his hands and arms together underneath his body and refusing to obey Valladolid's and Ramirez's orders to put his

18

arms behind his back. . . . [T]he Officers only placed Harris in handcuffs after using force to overcome Harris's resistance and move his arms out from underneath Harris's body."); (ECF No. 86 at 5) ("And once on the ground, Harris continued to physically resist against being restrained by placing his hands and arms underneath his body, and he refused to obey the officers' repeated orders to place his hands behind his back or by his sides."); (ECF No. 86 at 6) ("Even if Harris disagreed with the officers' orders to submit to being handcuffed behind his back, Harris's refusal to comply with orders presented a threat to the safety and security of the prison.").

As an initial matter, Plaintiff has presented evidence that he was physically unable to comply with Defendants' demand without significant pain, or injury—and not because he was willfully refusing orders. (ECF No. 84 at 21) ("Plaintiff was not physically resisting against being restrained. Plaintiff could not in any way put his arm behind his back to be cuffed."). Thus, a reasonable jury could find that Plaintiff was not voluntarily resisting orders to put his hands behind his back because he was physically unable to comply with those orders.

Moreover, Defendants interpretation that may use any amount of force whenever an inmate refuses to voluntarily submit to any order, is not a fair interpretation of these factors. On the contrary, the relevant inquiry is whether force was needed to prevent a threat to the safety of staff and inmates—and not whether it was needed to compel compliance with an order. *See Whitley v. Albers,* 475 U.S. 312, 321 (1986) ("But equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them . . . .").

The Supreme Court recently addressed this issue in the case of *Lombardo v. City of St. Louis, Missouri* 594 U.S. 464, 467–468 (2021). In that case, the district court had granted summary judgment to defendants on a claim for excessive force on a pretrial detainee based on the fact that the detainee was resisting the officers' efforts to subdue him. The Supreme Court reversed and remanded, finding that the fact that the detainee resisted the officers' directive was not itself sufficient to justify a use of force, stating:

> Although the Eighth Circuit cited the *Kingsley* factors, it is unclear whether the court thought the use of a prone restraint—no matter the kind, intensity, duration, or surrounding circumstances—is *per se* constitutional so long as an individual

19

appears to resist officers' efforts to subdue him. The court cited Circuit precedent for the proposition that "the use of prone restraint is not objectively unreasonable when a detainee actively resists officer directives and efforts to subdue the

detainee."      956 F.3d at 1013. The court went on to describe as "insignificant" facts that may distinguish that precedent and appear potentially important under *Kingsley*, including that Gilbert was already handcuffed and leg shackled when officers moved him to the prone position and that officers kept him in that position

for 15 minutes. See      956 F.3d at 1013–1015.

Such details could matter when deciding whether to grant summary judgment on an excessive force claim. Here, for example, record evidence (viewed in the light most favorable to Gilbert's parents) shows that officers placed pressure on Gilbert's back even though St. Louis instructs its officers that pressing down on the back of a prone subject can cause suffocation. The evidentiary record also includes well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of that risk. The guidance further indicates that the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands. Such evidence, when considered alongside the duration of the restraint and the fact that Gilbert was handcuffed and leg shackled at the time, may be pertinent to the relationship between the need for the use of force and the amount of force used, the security problem at issue, and the threat—to both Gilbert and others—reasonably perceived by the officers. Having either failed to analyze such evidence or characterized it as insignificant, the court's opinion could be read to treat Gilbert's "ongoing resistance" as

controlling as a matter of law.[3]      *Id.*, at 1014. Such a *per se* rule would contravene the careful, context-specific analysis required by this Court's excessive force precedent.

*Lombardo v. City of St. Louis, Missouri,* 594 U.S. 464, 467–468 (2021).  Here too, there is evidence that Plaintiff was prone on his stomach with multiple officers holding him down when Defendants used force to put his hands behind his back, and that in Defendants use of back-hand-cuffs was contrary to the prison's own procedures for restraining Plaintiff in particular.  Summary judgment is thus not appropriate merely because Plaintiff resisted Defendants' attempts to handcuff him behind his back.

Regarding whether Defendants made any effort to temper the severity of a forceful response, it is undisputed that Defendants made no attempt to retrieve waist chains to restrain Plaintiff according to the prison's own special cuffing procedures.  Instead, Defendants again argue that they tempered their response by ordering Plaintiff to put his hands behind his back

before they used force to pull them behind his back. (ECF No. 86 at 6) ("Once on the ground, Valladolid and Ramirez continued to temper their response by ordering Harris to put his hands behind his back and submit to restraints. (ECF No. 79-2 at ¶¶ 31-32.) However, Harris refused to obey those orders and physically resisted by holding his hands and arms underneath his body. (*Id.*) As a result, Valladolid and Ramirez, as well as Patrick and Forbes once they arrived on the scene, needed to use force to move Harris's hands behind his back and place him in handcuffs."). Construing the evidence in favor of Plaintiff, a reasonable jury could find that Defendants did not make any effort to temper their use of force in putting Plaintiff's hands behind his back over his objections by using an alternative form of restraint, as authorized by prison procedures.[6]

Thus, the Court recommends denying Defendants' motion for summary judgment because, construing the evidence in favor of Plaintiff, and evaluating the relevant factors, a reasonable jury could find that Defendants Valladolid, Ramirez, Forbes, and Patrick used excessive force against Plaintiff in handcuffing him behind his back in violation of the Eighth Amendment, and that Defendants Butler and Osmer failed to protect him from that use of force[7] in violation of the Eighth Amendment.

### B. Qualified Immunity

The Court next addresses whether Defendants are nevertheless entitled to qualified immunity for their actions.

Defendants first argue that "to the extent Harris asserts Valladolid and Ramirez used excessive force *when they took him to the ground*, Valladolid and Ramirez are entitled to qualified immunity because the Ninth Circuit has held that a physical takedown and other types of force does not constitute excessive force when the prisoner has chosen not to comply with a

---

[6] Defendants also argue that they tempered their responses to Plaintiff in the dispute that led to Plaintiff being restrained, i.e., in forcing Plaintiff out of the Officers' office. However, again, Plaintiff's claims in this case only concern Defendants' use of force in hand-cuffing Plaintiff behind his back, and not any use of force in the dispute leading to Defendants' decision to restrain Plaintiff.

[7] Defendants' argument regarding the failure to protect claims are dependent on their argument that there was no underlying excessive force. (ECF No. 86, at p. 8) ("Because the indisputable evidence described above shows Valladolid, Ramirez, Patrick, and Forbes did not use excessive force against Harris, there is also no material dispute of fact regarding whether Osmer and Butler were aware that the force being used on Harris was excessive, or that they consciously chose to ignore it.").

prison official's orders." (ECF No. 86 at 8). However, the claim in this case does not concern Defendants' use of force to take Plaintiff to the ground. It only concerns Defendants' use of force in hand-cuffing him behind his back, rather than using the approved waist chain protocol, once Plaintiff was already prone on the ground with multiple officers holding him down.

Regarding the force used to hand-cuff Plaintiff behind his back, Defendants argue:

> To the extent Harris asserts Valladolid, Ramirez, Patrick, Forbes, Osmer, and Patrick violated his Eighth Amendment rights by handcuffing him behind his back, or allowing force to be used on him, in violation of his special cuffing restrictions, a reasonable officer in Defendants' positions could have believed that using force to handcuff Harris under the circumstances was a lawful good faith effort to maintain or restore prison discipline. *See, e.g., Dukes v. Lizaola*, No. C 10–0864 CRB (PR), ECF No. 46 (N.D. Cal. July 22, 2011) (ruling defendants were entitled to summary judgment where officers handcuffed an inmate behind his back despite having recently undergone shoulder surgery and having a chrono ordering he not be handcuffed behind his back) , *aff'd* 486 F. App'x 642 (9th Cir. 2012) (unpublished).

As an initial matter, *Dukes* is an unpublished district court case. It is thus of limited relevance to the qualified immunity analysis. *See Sorrels v. McKee,* 290 F.3d 965, 971 (9th Cir. 2002) ("it will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only").

Moreover, it is well established that excessive force in the course of handcuffing may constitute excessive force. *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) ("It is well-established that overly tight handcuffing can constitute excessive force"); *Luchtel v. Hagemann*, 623 F.3d 975, 989 (9th Cir. 2010) (Beezer, J., concurring in part and dissenting in part) ("The right to be free from excessive force in handcuffing is clearly established in our precedent")); *Changamu v. Lamb,* 2025 WL 460912, at *13, (D. Ariz., Feb. 11, 2025, No. CV-22-01598-PHX-DGC (JFM)); *appeal dismissed sub nom. Changamu v. Gallo* (9th Cir., Apr. 8, 2025, No. 25-1364) 2025 WL 1563966 ("As to tight handcuffing, the Ninth Circuit and other circuit courts have long recognized that overly tight handcuffing may constitute excessive force, particularly where the handcuffs cause demonstrable injury or unnecessary pain, or when officers ignore or refuse requests to loosen the handcuffs once alerted that the cuffs are too tight."). Indeed, in the context of the Fourth Amendment, the Ninth Circuit stated in "1998, it was clearly

established that the amount of force [Plaintiff] says [Defendant used in handcuffing her was excessive." *Meredith v. Erath,* 342 F.3d 1057, 1061 (9th Cir. 2003) (denying qualified immunity because "[t]aking the facts in the light most favorable to Bybee, a reasonable jury could find that Agent Erath used an unreasonable amount of force in handcuffing her and as a result violated her Fourth Amendment rights. . . . Bybee did not pose a safety risk and made no attempt to leave the Sunset Beach property. . . . Bybee objected vociferously to the search and she "passively resisted" the handcuffing, but the need for force, if any, was minimal at best.").

Even so, *Dukes* is factually distinguishable.  First of all, in that case, unlike here, "the evidence in the record does not support [Plaintiff] having such a chrono [for special cuffing procedures] at the time of the incident." *Dukes*, 2011 WL 13194957, at *3.  Moreover, in that case, unlike here, there was no evidence that Plaintiff was injured by the hand-cuffing procedure. *Id.* ("[t]here is no indication that the amount of force used was disproportionate for the situation or that Dukes [Plaintiff] sustained significant injuries. . . . [Plaintiff] exhibited no sign of injury from having been handcuffed for such a short time.").  Additionally, there is no indication in that case that Plaintiff had presented evidence that he was physically unable to comply with the handcuffing orders, as is the case here.

Defendants also rely on *Dukes* to argue that they were entitled to qualified immunity because they believed it was an emergency situation.  It is true that one of the pieces of evidence cited in *Dukes* was that "[Defendant] followed established procedure that mandates handcuffing inmates behind the back in emergency situations. Ambriz Decl. ¶ 11. This procedure allows staff to ascertain whether an inmate has any weapons and restricts inmates' movements to ensure the safety of both staff and other inmates." *Id* at *3.  Here too, defendants have submitted two declarations stating that it was their understanding that special cuffing requirements did not apply to emergency situations where a prisoner is resisting being restrained.  (ECF No. 79-5 at 3) ("Based on my training and experience, it was my understanding at the time that the special-cuffing requirements do not apply to emergency situations. In emergency situations, such as this one where an incarcerated person is physically resisting against being restrained, it was my understanding that officers can use regular handcuffs to restrain the resisting inmate and that any specialized restraints (such as waist restraints) can be applied once the emergency is over.");

23

(ECF No. 79-6 at 3-4) (same).  As Plaintiff points out, Defendants have not submitted any description of these procedures, any documents supporting such exception, or any description of what constitutes an emergency situation.  Nevertheless, even assuming that Defendants' declarations are sufficient to conclude that such an exception existed, there is a dispute of fact as to whether Plaintiff posed such an emergency at the time he was handcuffed.  After all, the undisputed evidence indicates that Plaintiff was prone on his stomach and held down by multiple officers at the time he was hand-cuffed, and as described above, a reasonable jury could find that he did not pose a threat to any officer or inmate at the time.

Thus, and for the reasons set forth above in relation to the excessive force analysis, construing the evidence in favor of Plaintiff, the Court finds that Defendants are not entitled to qualified immunity because their actions constituted excessive force and failure to protect in light of established law at the time.

## VI.   CONCLUSION AND RECOMMENDATIONS

Accordingly, IT IS RECOMMENDED that

1.  Defendants' motion for summary judgment (ECF No. 79) be **DENIED.**

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any objections shall be limited to no more than fifteen (15) pages, including exhibits. Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).
IT IS SO ORDERED.

Dated:   __**April 17, 2026**__          ___/s/ Erica P. Groj_____
                                                      UNITED STATES MAGISTRATE JUDGE

24